# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRIC OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **DEITRICH WHITE,** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO. H-12-01588** |
| **CAROLYN W. COLVIN, ACTING** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,**[1] | § | |
| | § | |
| **Defendant** | § | |

## MEMORANDUM AND ORDER

Before the Magistrate Judge[2] in this social security appeal is Plaintiff's Motion for Summary Judgment (Document No. 10), Defendant's Motion for Summary Judgment (Document No. 9), and Defendant's Response to Plaintiff's Motion for Summary Judgment (Document No. 11). After considering the cross-motions for summary judgment, the administrative record, and the applicable law, the Magistrate Judge ORDERS that, for the reasons set forth below, Defendant's Motion for Summary Judgment (Document No. 9) is GRANTED, Plaintiff's Motion for Summary Judgment (Document No. 10) is DENIED, and the decision of the Commissioner of the Social Security Administration is AFFIRMED.

### I. INTRODUCTION

Plaintiff Deitrich Darnell White ("White") brings this action pursuant to 42 U.S.C. 1383(c)(3) and 42 U.S.C. 405(g) for judicial review of the final decision of the Commissioner of

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] The parties consented to proceed before the undersigned Magistrate Judge on January 15, 2013. [Document No. 8].

the Social Security Administration ("the Commissioner") denying White's claims for social

security disability insurance benefits ("DIB") and supplemental security income ("SSI"). White

claims he has been disabled since September 20, 2010, due to myopia (near-sightedness) in both

eyes, depression, bipolar disorder, and schizoaffective disorder.   (Tr. 116, 122, 143). The

Administrative Law Judge ("the ALJ") found that White was not disabled under the Social

Security Act ("the Act"). (Tr. 16–24). White argues that the ALJ erred in not considering the low

GAF scores given him by his treating psychiatrists. White argues that GAF scores of 44 and 45

suggest he will be unable to sustain employment.[3] (Document No. 10 at 5). White additionally

argues that the ALJ failed to take into account the medications prescribed by his treating

physicians to treat his psychological disorders. (*Id.*). White further argues that the ALJ

erroneously interjected unsupported medical findings into the record, such as claims that White

was malingering. (*Id.*). The Commissioner responds that the ALJ properly applied the law and

that substantial evidence supports the ALJ's decision. (Document No. 11 at 1–4). The

Commissioner therefore asks this Court to affirm his decision to deny benefits. (*Id.* at 5).

## II. Administrative Proceeding

On November 30, 2010, White filed claims for DIB (Tr. 122–125) and SSI (Tr. 116–121)

under Titles II and XVI, respectively, of the Act, 42 U.S.C. §§ 423, 1383(c). White claimed he

had been disabled since September 20, 2010, due to depression, myopia, and bipolar disorder.

(Tr. 144). White's claims were denied at the initial determination (Tr. 54–65) and again upon

reconsideration (Tr. 68–71, 74–75). White then obtained counsel (Tr. 66–67) and filed a request

---

[3] The Global Assessment of Functioning ("the GAF") scale rates a patient's psychological, social, and occupational functioning on a continuum from 1 to 100. A GAF score from 41 to 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, conflicts wither peers or co-workers, inability to keep a job). *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (*DSM–IV–TR*) at 34 (4th ed. text rev.2000). The GAF scale is no longer included in the *DSM–V*.

for a hearing before an ALJ (Tr. 72–73). On November 23, 2011, ALJ Daniel E. Whitney held a hearing at which White appeared with counsel and testified. (Tr. 29–51). Vocational expert ("VE") Cecile Johnson attended this hearing and testified as an expert witness. (Tr. 29–31, 35, 37, 51–52). The ALJ issued a decision on December 9, 2011, finding that White was not disabled under the Act. (Tr. 13, 16–24).

White subsequently filed a request for review of the ALJ's decision with the Appeals Council. (Tr. 12). The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) the ALJ appears to have abused his or her discretion; (2) there is an error of law; (3) the ALJ's decision is not supported by substantial evidence; (4) there is a broad policy or procedural issue that may affect the public interest; or (5) the Appeals Council receives new and material evidence which renders the ALJ's decision contrary to the weight of all the evidence on record. On March 30, 2012, the Appeals Council denied White's request for review. (Tr. 1–3). This rendered the ALJ's decision final.

White timely commenced the instant action, requesting this Court to review the Commissioner's final administrative decision. This appeal is now ripe for ruling. The evidence is set forth in the transcript, pages 1 through 389. (Document Nos. 3-4 to 3-11). There is no dispute as to the facts contained therein.

### III. STANDARD OF REVIEW OF AGENCY DECISION

In reviewing a denial of disability benefits, a court is only to determine "(1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). The Act specifically grants the district court the power to enter judgment upon the pleadings and transcript, "affirming, modifying, or reversing the decision of the Commissioner

of Social Security with or without remanding the case for a rehearing." 42 U.S.C. § 405(g). However, the district court is not to "re-weigh the evidence in record, try the issues de novo, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000) (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).

The Supreme Court has defined substantial evidence under the Act as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richard v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

## IV. Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve

months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. *Id.* § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> [H]e is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id.* § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if he is "incapable of engaging in any substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milan v. Bowen*, 782 F. 2d 1284 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to determine disability status: (1) the Commissioner will not find a claimant engaged in substantial gainful activity to be disabled, regardless of the medical findings; (2) the Commissioner will not find a claimant to be disabled unless he has a severe impairment or combination of impairments; (3) the Commissioner will presumptively find a claimant whose impairment(s) meets or is equivalent to an impairment listed in Appendix 1 of the regulations to be disabled, and benefits will be awarded; (4) the Commissioner will not find a claimant who is able to do past relevant work disabled; and (5) if the claimant is unable to do past relevant work, the Commissioner will consider factors such as the claimant's age, education, work experience, and residual function capacity (RFC) to determine whether the claimant can do any other work. *Id.* at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); 20 CFR 404.1520(a) and 416.920(a). Under this analysis, the claimant bears the burden of proof on the first four steps to establish that a disability exists. If successful, the

burden shifts to the Commissioner at step five to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). Once the commissioner demonstrates that other jobs are available, the burden shifts back to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If at any step in the process the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 563.

In the present case, the ALJ determined that White was not disabled at step four because he retained the RFC to perform his previous jobs of dishwasher, janitor, and fast food worker, both as he actually performed them and as others generally perform those jobs in the national economy. (Tr. 23, 34, 51–52). Additionally, at step five, the ALJ found that there are other jobs existing in the national economy which White would be able to perform, such as laundry worker (10,000 positions in Texas, 275,000 nationally), general laborer (8,000 positions in Texas, 240,000 nationally), and kitchen helper (7,000 positions in Texas, 285,000 nationally). (Tr. 23, 52). Going through the five-step analysis, the ALJ determined that: (1) White had not engaged in substantial gainful activity since September 20, 2010, the alleged onset date (Tr. 18); (2) White has medically determinable severe impairments of bipolar disorder and schizoaffective disorder, and his vision is not a severe impairment (Tr. 18–19); (3) White does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in Appendix 1 of the regulations (Tr. 19–20); (4) White has the RFC[4] to perform the past relevant work of dishwasher, janitor, and fast food worker (Tr. 23–24); and (5) in the alternative, considering White's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy which White can perform (*Id.*). As a result of the

---

[4] The ALJ determined that White has the RFC to perform a full range of work at all exertional levels with the following limitations: the work must be restricted to—(a) understanding, remembering, and carrying out detailed but not complex tasks; (b) making detailed but not complex work-related decisions; and (c) having frequent, but not constant contact with the public, co-workers, or supervisors. [Tr. 20–22].

ALJ's findings, this Court must determine whether substantial evidence supports the ALJ's decision.

V. DISCUSSION

In determining whether substantial evidence supports the ALJ's decision, the district court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining, and consultative physicians on subsidiary questions of fact; (3) subjective evidence as testified by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age. *Wren*, 925 F.2d at 126.

### A. Objective Medical Evidence

White's medical record begins with his hospitalization on October 26, 2010, due to his depressive state. He was admitted to Ben Taub Hospital. (Tr. 44–45, 215, 224). White was involuntarily transferred from the NeuroPsychiatric Center (NPC) at Ben Taub to the Harris County Psychiatric Center (HCPC) for medical treatment. (Tr. 215). White reported a history of substance abuse of alcohol and marijuana, though he was drug free at this time. (Tr. 225).

White was discharged on November 3, 2010. (Tr. 224). The discharge report completed by Dr. Samina Siddiqui notes that White was compliant with treatment, tolerated the medications, had a euthymic mood with no agitation, suicidal ideation, or homicidal ideation, had no overt psychosis or bizarre behavior, had improved self-care and thought processing, and was experiencing less depression. (Tr. 227). White was scheduled a follow-up appointment with Bruce Wiley M.D. ("Dr. Wiley"). (Tr. 259).

Dr. Wiley, through the Mental Health and Mental Retardation Authority ("the MHMRA") of Harris County, conducted a psychiatric assessment of White at his November 8, 2010, appointment. (Tr. 242). Notably, Dr. Wiley expressed suspicion that White was "wanting

7

to say yes to anything along with other symptoms for depression too," and noted that White was seen outside "interacting and smiling with others." (*Id.*). White's mental status examination indicated that he was neatly groomed, casually dressed, cooperative, and euthymic. White had appropriate affect, goal directed thought processes, no hallucinations, no homicidal or suicidal intent, and fair insight and judgment. (*Id.*). In his case formulation, Dr. Wiley opines "[White] seems to be educated and wanting to say yes to most questions for diagnosis; r/o gain. . . . [White] reports most traits of Borderline Personality disorder but again wonder if pt just answering yes to everything prompted." (Tr. 244). Dr. Wiley diagnosed White with bipolar disorder, alcohol dependence, and cannabis dependence. (Tr. 246). White was also given a GAF of 44. (Tr. 247).

White returned to the MHMRA of Harris County for a follow-up appointment on December 17, 2010. (Tr. 262). White's mental status examination indicated that he appeared neatly groomed and casually dressed, was cooperative, had normal motor activity and speech, and had an euthymic mood, appropriate affect, and goal directed thought process. White showed no signs of experiencing hallucinations, delusions, suicidal intent, or homicidal intent. He was alert with intact cognition and fair insight and judgment. (Tr. 262–263). White did not get his lab tests done because he did not fast. He had not taken his medication for several weeks. He reported that he had "been doing alright." Additionally, White's mother reported that White had "been doing ok . . . ." (Tr. 262). White was instructed to restart his medications, avoid substance abuse, watch his diet, and stay active. (Tr. 263).

White was next seen on January 28, 2011, by the MHMRA of Harris County. (Tr. 343). White reported taking medications as prescribed, but complained that the medicine "makes me sleep." White reported feeling depressed due to financial issues "cause I'm not working." White

reported that he filed for social security and was told that "its [sic] not in his best interest to be working." White's mother reported that "he's doing pretty good." (Tr. 343). White's mental status examination was the same as it was on December 17, 2010. (Tr. 343–344).

In connection with his application for benefits, White was referred by the Disability Determination Division to J.L. Paterson, Ph.D. ("Dr. Paterson"). Dr. Paterson gave White a clinical interview and mental status examination on February 28, 2011. (Tr. 268–271). Dr. Paterson noted that White was on time to the appointment, was casually dressed with good hygiene, made good eye contact and was wearing eye glasses, was spontaneously verbal, could adequately express himself in the English language, and was cooperative. (*Id.*). White reported that he had experienced mood swings "most of my life." White's mental status examination reflects that his affect was flat during the exam, his thought processes were logical and coherent, his immediate memory was intact, his recent memory was intact, his remote memory was deficient (as indicated by his inability to recall the first President of the United States and four recent Presidents), his concentration was below average, his general fund of knowledge was intact, his intellectual functioning appeared borderline to low average, his abstract thinking was deficient (based on his failure to interpret two proverbs); and his insight and judgment were fair. (Tr. 270). White was given a GAF of 50. (Tr. 271).

On March 15, 2011, Blain Carr, Ph.D. ("Dr. Carr") completed a psychiatric review technique based on his review of the medical record. (Tr. 273–286). Dr. Carr found that White did not meet or equal Listing 12.04 (bipolar disorder) (Tr. 276) or Listing 12.09 (substance abuse) (Tr. 281). Dr. Carr evaluated White's rating of functional limitations by first looking at

his "B" criteria.[5] White had mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. He had one or two episodes of decompensation, each of extended duration. (Tr. 283). There was insufficient evidence to establish the presence of "C" criteria. (Tr. 284). Dr. Carr noted that White was "somewhat limited by psychiatric symptoms, but this does not wholly comprise [his] ability to function independently, appropriately, and effectively on a sustained basis." (Tr. 285).

Dr. Carr also assessed White's mental residual function capacity ("MRFC"). (Tr. 287– 290). Dr. Carr opined the following about White—his ability to remember locations and work-like procedures was not significantly limited; his ability to understand and remember very short and simple instructions was not significantly limited; his ability to understand and remember detailed instructions was moderately limited; his ability to carry out very short and simple instructions was not significantly limited; his ability to carry out detailed instructions was moderately limited; his ability to maintain attention and concentration for extended periods was moderately limited; his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances was not significantly limited; his ability to sustain an ordinary routine without special supervision was not significantly limited; his ability to work in coordination with or proximity to others without being distracted by them was not significantly limited; his ability to make simple work-related decisions was not significantly limited; and his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable

---

[5] To satisfy the "paragraph B" criteria, the mental impairment(s) must result in at least marked restriction in two of the categories, or at least marked restriction in one of the categories with repeated episodes of decompensation, each of extended duration (three episodes in one year, each lasting for at least two weeks). [Tr. 19].

number and length of rest periods was moderately limited. Additionally, Dr. Carr opined as follows about White's social interaction and adaptation functioning—his ability to interact appropriately with the general public was not significantly limited; his ability to ask simple questions or request assistance was not significantly limited; his ability to accept instructions and respond appropriately to criticism from supervisors was moderately limited; his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes was moderately limited; his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness was not significantly limited; his ability to respond appropriately to changes in the work setting was moderately limited; his ability to be aware of normal hazards and take appropriate precautions was not significantly limited; his ability to travel in unfamiliar places or use public transportation was not significantly limited; and his ability to set realistic goals or make plans independently of others was not significantly limited. Overall, Dr. Carr concluded: "[White] can maximally understand, remember, and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in routine work settings." (Tr. 289).

On March 30, 2011, John Dufor, M.D. ("Dr. Dufor") reviewed White's medical records in light of White's allegation that he was disabled due to eye impairments and concluded he was not disabled. (Tr. 291). Dr. Dufor noted that White had no problems seeing, that he was able to drive and use public transportation, and that there was no evidence that he was blind. (*Id.*).

On March 31, 2011, White had an appointment at the MHMRA of Harris County. White reported that he was depressed "a little bit" from "not working like as usual." White's mother stated that White had "been doing fine." Additionally, she said that the Celexa medication caused

an allergic reaction in White, making his face swell, so the doctor changed his medication. (Tr. 318). White's mental status examination was the same as it was on December 17, 2010. (Tr. 318–319).

On May 3, 2011, Michael A. Bloome, M.D. ("Dr. Bloome") of Houston Eye Associates examined White. He diagnosed White with high myopia in both eyes. Dr. Bloome noted that White's vision was corrected by prescription eye glasses, and he had no ocular abnormalities. Dr. Bloome indicated that White's prognosis was good. (Tr. 331–36).

On June 28, 2011 White saw Dr. Wiley for monitoring of his medication. (Tr. 355). White was neatly groomed, calm and cooperative, and made good eye contact. White had missed his last appointment and was scheduled for another on July 8, 2011. (*Id.*).

On July 8, 2011, White appeared at the MHMRA of Harris County for an assessment by Dr. Wiley. (Tr. 356). White had gained twelve pounds since May 12, 2011. White reported that his sleeping had been better but not as good as he wanted, and that he was depressed "about life circumstances." White reported a lack of appetite and activity. He also reported auditory hallucinations "pretty much seven days out of the week," but Dr. Wiley noted that White "seem[ed] to be over-reporting." White's mental status examination was the same as it was on December 17, 2010. (Tr. 356–357).

On August 19, 2011, White was seen by Dr. Wiley. White again reported daily auditory hallucinations. He also reported that he was living with his mother and "getting along pretty well; every once in a while we have moments." White's mental status examination remained unchanged. (Tr. 361–362). Dr. Wiley expressed some concern about White's compliance with his prescriptions. White requested a different doctor. (Tr. 362).

Because he requested a different doctor, White was seen by Nishan Adihetty, M.D. ("Dr. Adihetty") on September 19, 2011. (Tr. 382, 384). White reported chronic suicidal ideation without any intent or plan to follow through. White's mental status examination indicated the following: White appeared neatly groomed and casually dressed, was cooperative, had normal motor activity and speech, and had a depressed mood, appropriate affect, and goal directed thought process. White's thought content indicated the presence of hallucinations and delusions. White also had suicidal ideation without plans, but no homicidal ideation. He was alert with intact cognition and limited insight and judgment. (Tr. 382–383). White was instructed to cross taper Risperidal with Zyprexa, to continue Depakote and Trazadone, to increase his Zoloft intake, and to watch his diet and be active. Instead of receiving therapy, White indicated he would seek counseling with his pastor. (Tr. 383).

On November 21, 2011, White received a letter from Dr. Adihetty of the MHMRA of Harris County confirming that White had been receiving services at the Northwest Community Clinic since November, 2010. (Tr. 388). Additionally, the letter stated that White had been diagnosed with schizoaffective disorder and had social, occupational, economic, and educational problems, as well as problems accessing healthcare. White was given a GAF of 45. (*Id.*).

Here, substantial evidence supports the ALJ's finding that White's impairments of bipolar disorder and schizoaffective disorder were severe impairments at step two, that such impairments at step three, individually or in combination, did not meet or equal a listed impairment, and that he had the RFC to perform a full range of work at all exertional levels with the restriction that work is limited to understanding, remembering, and carrying out detailed but not complex tasks, making detailed but not complex work-related decisions, and having frequent but not constant contact with the public, co-workers, and supervisors. (Tr. 20–21). In making this

finding, the ALJ considered the medical record as a whole, including White's subjective complaints as to his impairments and the opinions of medical sources. (Tr. 21–23). In particular, the ALJ's RFC determination recognized the treating records at the MHMRA, the evaluation of Dr. Paterson performed on February 28, 2011, and Dr. Carr's mental RFC. The record further supports the ALJ's finding that White's eye impairment was not a severe impairment. This factor weighs in favor of the ALJ's decision.

## B. Diagnosis and Expert Opinion

The second factor to be considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. Unless good cause is shown to the contrary, "the opinion, diagnosis, and medical evidence of the treating physician, especially when the consultation has been over a considerable amount of time, should be accorded considerable weight." *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981). For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusional and must be supported by clinical and laboratory findings. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981). Indeed, "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence.'" *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (quoting *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995)). The opinion of a medical specialist is generally accorded more weight than opinions of non-specialists. *Id.* "[T]he Commissioner is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Martinez*, 64 F.3d at 176 (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057) (internal quotes omitted). Further, regardless of the opinions and diagnoses

of medical sources, "the ALJ has sole responsibility for determining a claimant's disability status." *Martinez*, 64 F.3d at 176.

The Social Security Regulations provide a framework for the consideration of medical opinions. Under 20 C.F.R. §§ 404.1527(d)(2)–(6), 416.927(d)(2)–(6), consideration of a physician's opinion must be based on: (1) the physician's length of treatment of the claimant; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the support of the physician's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the treating physician. *Newton*, 209 F.3d at 456. While opinions of treating physicians need not be afforded controlling weight on the issue of disability, in most cases such opinions must at least be given considerable deference. *Id.* Again, the Social Security Regulations provide guidance on this point. Social Security Ruling 96-2p provides:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Social Security Ruling ("SSR") 96-2p, 61 Fed. Reg. 34490, 34491 (July 2, 1996). With regard to the weight to be given "Residual Functional Capacity Assessments and Medical Source Statements," the Rule provides that "adjudicators must weigh medical source statements under the rules set out in 20 C.F.R. 404.1527 . . . , providing appropriate explanations for accepting or rejecting such opinions." SSR 96-5p, 61 Fed. Reg. 344712, 34474 (July 2, 1996).

The Fifth Circuit adheres to the view that before a medical opinion of a treating physician can be rejected, the ALJ must consider and weigh the six factors set forth in 20 C.F.R. § 404.1527(d). *Newton*, 209 F.2d at 456. "The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Id.* at 455; *see also Cole v. Barnhart*, 288 F.3d 149, 151 (5th Cir. 2002) ("It is well-established that we may only affirm the Commissioner's decision on the grounds which he stated for doing so."). However, perfection in administrative proceedings is not required. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

White argues that the ALJ erred by discounting the low GAF scores he received on several occasions by his treating physicians. He suggests that with a GAF score of 45, he is "unfit for employment or at least unable to sustain employment." (Document No. 10 at 5). A GAF score is not determinative of a claimant's ability to work. *See* 65 Fed. Reg. 50746, 50764–65 (Aug. 21, 2000) (declining to use the GAF scale for Social Security and SSI disability programs because the scale "does not have a direct correlation to the severity requirements in our mental disorder listings"); *see also, e.g., Amason v. Colvin*, No. 4:11-CV-805-A, 2013 WL 1413023 at *8 (N.D. Tex. Mar. 1, 2013). Instead, GAF scores are snapshots of a patient's mental function at the time of the evaluation, and the score can greatly fluctuate over time. *See DSM–IV–TR* at 33 ("In most instances, ratings on the GAF scale should be for the current period . . ."); *see also Via v. Astrue*, No. 3:09cv00274, 2010 U.S. Dist. LEXIS 102917, at *9 n. 6 (S.D. Ohio July 9, 2010) (stating that generally, a GAF score is a snapshot of overall psychological functioning at or around the time of the evaluation); *Davis v. Astrue*, No. JKS 09-2545, 2010 U.S. Dist. LEXIS 132972 at *11 (D. Md. Dec. 16, 2010) (stating GAF scores are snapshots which vary widely over time). It is true that a GAF score of 40–50 may indicate "serious

impairment in social, occupational, or school functioning." *DSM–IV–TR* at 34. However, without evidence that the patient received the score because of serious impairment in occupational functioning, the score does not prove the existence of a severe impairment. *Busby v. Astrue*, No. 3-11-CV-0224-BD, 2012 U.S. Dist. LEXIS 38643 at *14 (N.D. Tex. Mar. 21, 2012) (citing *Hill v. Astrue*, No. H–08–3160, 2009 WL 2901530 at *7 (S.D. Tex. Sept. 1, 2009)); *see also Cainglit v. Barnhart*, 85 F. App'x. 71, 74–75 (10th Cir. 2003) (without evidence that treating physician gave a low GAF score because of perceived inability to work, the score does not indicate a severe impairment).

The records show that White's GAF score fluctuated over the course of his treatment. For example, when admitted to the hospital on October 26, 2010, he had a GAF score of 25. (Tr. 219). At the time of his discharge from the hospital in November 2010, White was given a GAF score of 44. (Tr. 247). On February 28, 2011, White was given a GAF score of 50 by Dr. Paterson. (Tr. 271). Finally, in November of 2011, White was given a GAF score of 45 by Dr. Adihetty. (Tr. 388). There is no evidence in the record that these scores were given because White's treating physicians considered him unable to work. Therefore, White's fluctuating scores are merely snapshots of his mental state at the time of the evaluation. The ALJ did not err by not finding White disabled based on his GAF scores.

White further argues that the medications prescribed him by his treating psychiatrists to combat psychological disorders are evidence of the severity of those disorders. (Document No. 10 at 5). While the medications prescribed White are certainly some evidence that he has bipolar disorder, the fact that the medications were prescribed does not render him disabled within the meaning of the Act. The treating records show that White's symptoms responded to medication, especially when he was compliant. To the extent that the ALJ did not explicitly mention each of

17

the medications being taken by White in his ruling, The ALJ is not required to mention every piece of evidence in making his decision, so long as it is apparent that he considered the record as a whole. *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (citing *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995)). The ALJ found that White showed improvement with treatment (including medications), that there was some concern that White was not taking his medications, and that if White's symptoms were as severe as alleged, "the evidence would not show improvement with treatment, and the claimant would follow his doctor's orders regarding the prescribed treatment regimen." (Tr. 22). The undersigned finds that the ALJ appropriately considered White's prescriptions in examining the treating records of White's medical sources.

White argues that the ALJ, in reaching his conclusion that White is not disabled under the Act, "injected medical findings, such as malingering, into the medical record that are not supported." (Document No. 10 at 5). The undersigned finds this contention to be without merit. Dr. Wiley, White's treating physician from November 2010 to November 2011, questioned whether White was malingering both in his initial appointment with White and in his case formulation. At his November 8, 2010, appointment with the MHMRA of Harris County, Dr. Wiley noted that White: (1) "[was] wanting to say yes to anything . . . ." (Tr. 242); and (2) "seems to want to say yes to everything." (Tr. 243). In Dr. Wiley's case formulation of the same day, he noted that White: (1) "seems to be educated and wanting to say yet to most questions for diagnosis; r/o gain." (Tr. 244); and (2) "reports most traits of Borderline Personality disorder but again wonder if pt just answering yes to everything prompted." (Tr. 244). Additionally, on July 8, 2011, after White complained of experiencing auditory hallucinations "pretty much seven days out of the week," Dr. Wiley opined that White "seem[ed] to be over-reporting." (Tr. 356–357).

With respect to the opinions and diagnoses of treating physician and medical sources, the

ALJ writes:

> In terms of the claimant's mental problems, the evidence of record is inconsistent
> with the severity of symptoms alleged. Although he complains of depression that
> goes back several years, this did not prevent him from working before the alleged
> onset date (Exhibits 4-D, page 7; 2-E, page 3; and 2-F, page 17). Further, the
> evidence does not reflect treatment before a psychiatric hospital admission in
> October 2010 for bipolar disorder and suicidal ideation (Exhibit 1-F, page 6).
> However, the claimant responded well to treatment and was discharged in stable
> condition after a few days (Exhibit 1-F, page 14). He further reported
> improvement with treatment (Exhibit 2-F, page 18). He was diagnosed with
> bipolar disorder in November 2010 as well as drug and alcohol dependence
> (Exhibit 2-F, page 6). He has subsequently been diagnosed with a schizoaffective
> disorder (Exhibit 14-F, page 1). Nevertheless, a treating mental health care
> professional noted in November 2010 that the claimant smiled and interacted well
> with others during breaks in treatment (Exhibit 2-F, page 2). The source also
> indicated that the claimant seemed to want to say yes to everything when being
> asked about symptoms to obtain a diagnosis for secondary gain reasons (Exhibit
> 2-F, pages 3-4 and 22). The claimant complained of difficulty concentrating in
> February 2011 but denies suicidal ideation or psychotic symptoms, which is
> consistent with improvement over October 2010 (Exhibit 8-F, page 10). His
> mother reported he was doing pretty well in January 2011 (Exhibit 13-F, page 1).
>
> Although the claimant made complaints of no improvement in symptoms despite
> taking medication, the record is inconsistent with compliance with prescribed
> treatment (Exhibit 13-F, page 37). In January 2011, he asserted that he was stable
> without taking the prescribed medication for 2-3 weeks (Exhibit 2-F, page 23; and
> 13-F, page 2). As well, he went several weeks without medication in July 2011
> and missed a treatment appointment in June 2011 (Exhibit 13-F, pages 13 and
> 15). His treating mental health professionals were still concerned about
> compliance issues in August 2011 (Exhibit 13-F, page 20). As well, he has a
> history of drug and alcohol abuse (Exhibit 2-F, pages 3, 6, and 13). I find that if
> the claimant's symptoms were as severe as alleged, then his treating mental health
> professionals would not have been concerned about secondary gain, the evidence
> would not show improvement with treatment, and the claimant would follow his
> doctor's orders regarding the prescribed treatment regimen. However, the
> evidence as a whole is consistent with symptoms that are resolved by the work
> restrictions contained in the residual functional capacity evaluation.
>
> In February 2011, psychologist J.L. Patterson [sic], PhD, conducted a consultative
> psychological examination of the claimant. In a less than exhaustive interview,
> Dr. Patterson concluded with a diagnosis of bipolar disorder, depressed,
> moderation and alcohol and cannabis abuse by history. She assessed the claimant

with a global assessment of functioning (GAF) of 50, which indicates serious symptoms. Dr. Patterson's findings are consistent with the record as a whole.

The record reflects the claimant's history of substance abuse; however, I find the claimant is not disabled regardless of whether consideration is given to any possible continuing substance abuse. Therefore, the claimant's possible substance abuse disorder is not considered a contributing factor material to the determination of disability. (See 20 CFR 404.1535 and 416.935).

As for the opinion evidence, no treating medical source has opined that the claimant is disabled pursuant to the Social Security Act (SSR 96-2p). Since they are consistent with substantial evidence of record, the opinions of the State Agency Consultants and the consultative examiner are given great weight (Exhibits 4-F and 6-F) (SSR 96-6p).

(Tr. 21–22). The ALJ's findings are consistent with the record and not an injection of unsupported facts, as alleged by White. Because the ALJ's evaluation of the diagnosis and opinions of medical experts comports with the substantial evidence of the record, this factor weighs in favor of the ALJ's decision.

### C. Subjective Complaints

The next factor to be weighed is the subjective evidence of White's impairment, including testimony and corroboration by family and friends. The act requires this Court's findings to be deferential to the ALJ; the evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant. *Hames*, 707 F.2d at 166.

At the November 23, 2011, hearing, White testified about his impairments. (Tr. 29–53). White testified that he has never lived on his own and was currently living with his mother, that he had been imprisoned for aggravated robbery in 1999, where he stayed for two and a half years, and that he had never obtained his GED. (Tr. 38, 45). White stated that his vision problems are corrected with glasses. (Tr. 40). He further claimed that was losing jobs due to his mental condition, which prevented him from functioning. (Tr. 37, 41). However, White then

claimed that he was unable to work because he "would do [the job] a different way than what they want me to do it." (*Id.*). When asked by the ALJ if he would do the job the way he was told to, knowing that he might be fired otherwise, White initially stated that he would not follow instructions because of his mental disability (Tr. 42), but then stated that he would be more inclined to do the job as required knowing he could be fired for insubordination (Tr. 43). White claimed that he heard voices in his head daily, instructing him to hurt himself and others, but that he has not acted on them and knows to resist them. (Tr. 43–44). White went on to testify that he was taking his medication as prescribed, but that they were making him worse; specifically, White claimed that he had not been eating or sleeping as well as he should, and that he still felt depressed. (Tr. 45–46). When asked what he does every day, White answered that he sleeps, watches television, and does light housework and some yard work. White could dress himself, but stated that he would probably starve to death if his mother did not cook for him. (Tr. 46–47). When asked about social interaction, White claimed that he never visits family or friends, only talks to one friend, texts people on his cell phone occasionally, and goes to church. (Tr. 48–49). White then claimed that he talks to his brother as well. (Tr. 50).

The ALJ found many of White's claims as to the severity of his symptoms to not be credible to the extent they are inconsistent with his RFC assessment. Concerning White's subjective complaints, the ALJ wrote:

> In considering the claimant's symptoms, I must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.
>
> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, I must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's

functioning. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, I must make a finding of credibility of the statements based on a consideration of the entire record.

During the hearing, the claimant testified to the following:

> He stopped working as a household mover near the time of alleged onset because of mental problems but he later testified that he was let go from his job. He worked at this job for about a year and was paid cash. He was in prison for about 2 ½ years following a conviction for aggravated robbery. He has access to treatment through a gold card and lives with his mother. He has trouble maintaining attention and cannot finish simple tasks. He has trouble sleeping and [sic] night and hears voices during the day. He was in the hospital for psychiatric reasons in October 2010. He has been on medication since November 2010 but is still depressed. He is able to take care of his personal needs as well as sweep and take out the trash. He sometimes mows the lawn also. He socializes with his brother and attends church.

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, his statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

In terms of the claimant's mental problems, the evidence of record is inconsistent with the severity of symptoms alleged. Although he complains of depression that goes back several years, this did not prevent him from working before the alleged onset date (Exhibits 4-D, page 7; 2-E, page 3; and 2-F, page 17). Further, the evidence does not reflect treatment before a psychiatric hospital admission in October 2010 for bipolar disorder and suicidal ideation (Exhibit 1-F, page 6). However, the claimant responded well to treatment and was discharged in stable condition after a few days (Exhibit 1-F, page 14). He further reported improvement with treatment (Exhibit 2-F, page 18). He was diagnosed with bipolar disorder in November 2010 as well as drug and alcohol dependence (Exhibit 2-F, page 6). He has subsequently been diagnosed with a schizoaffective disorder (Exhibit 14-F, page 1). Nevertheless, a treating mental health care professional noted in November 2010 that the claimant smiled and interacted well with others during breaks in treatment (Exhibit 2-F, page 2). The source also indicated that the claimant seemed to want to say yes to everything when being asked about symptoms to obtain a diagnosis for secondary gain reasons (Exhibit 2-F, pages 3-4 and 22). The claimant complained of difficulty concentrating in February 2011 but denies suicidal ideation or psychotic symptoms, which is consistent with improvement over October 2010 (Exhibit 8-F, page 10). His mother reported he was doing pretty well in January 2011 (Exhibit 13-F, page 1).

Although the claimant made complaints of no improvement in symptoms despite taking medication, the record is inconsistent with compliance with prescribed treatment (Exhibit 13-F, page 37). In January 2011, he asserted that he was stable without taking the prescribed medication for 2-3 weeks (Exhibit 2-F, page 23; and 13-F, page 2). As well, he went several weeks without medication in July 2011 and missed a treatment appointment in June 2011 (Exhibit 13-F, pages 13 and 15). His treating mental health professionals were still concerned about compliance issues in August 2011 (Exhibit 13-F, page 20). As well, he has a history of drug and alcohol abuse (Exhibit 2-F, pages 3, 6, and 13). I find that if the claimant's symptoms were as severe as alleged, then his treating mental health professionals would not have been concerned about secondary gain, the evidence would not show improvement with treatment, and the claimant would follow his doctor's orders regarding the prescribed treatment regimen. However, the evidence as a whole is consistent with symptoms that are resolved by the work restrictions contained in the residual functional capacity evaluation.

* * *

In sum, the above residual function capacity assessment is supported by the whole of the evidence. However, in crafting the residual functional capacity evaluation, I have given the claimant's subjective complaints the greatest consideration reasonably supported by the evidence.

(Tr. 21–23). The undersigned finds that there is nothing in the record to suggest that the ALJ made improper credibility findings, or that he weighed testimony improperly. Accordingly, this factor also supports the ALJ's decision.

### D. Claimant's Education, Work History, and Age

The final factor to be weighed is the claimant's educational background, work history, and present age. A claimant will be determined to be disabled only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

The record shows that White was born on April 18, 1975. He was 36 years old at the time of the hearing. (Tr. 18, 37, 54). White either completed or dropped out of school during the 11th

grade. (Tr. 37, 144). White worked as a concession worker in 2003, a dishwasher for a restaurant intermittently from 2004 to 2007, a furniture mover from 2008 to 2009, and a janitor from September 2009 to September 20, 2010. (Tr. 145). On a work history report, White indicated that he had worked as a sacker for Albertsons from June to September of 1997, a dishwasher for BBQ Inn from January to December of 1999, a concession stand worker for Aramark Sports from 2003 to 2004, a janitor and lead dishwasher at BBQ Inn from 2004 to September of 2006, a dishwasher for Pappas BBQ from September 2006 to December of 2007, and a Janitor for FW Services from January 2007 to September 20, 2010. (Tr. 159).

At the hearing, the ALJ questioned VE Cecile Johnson about White's ability to engage in gainful work activities. (Tr.51–52). "A vocational expert is called to testify because of his familiarity with job requirements and working conditions. 'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)). It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record.  Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." *Bowling*, 36 F.3d at 436.

The ALJ posed the following hypothetical questions to the VE:

Q. Ms. Johnson, for all hypotheticals, assume a person the same age, education, and work history as the Claimant. Let's assume a person is limited with no

exertional limited [sic], but able to understand, remember, and carry out detailed instructions and make judgments on detailed work-related decisions, frequent interaction with the public, co-workers and supervisor, and based on these limitations, any past work available?

A. Yes, sir, all of the jobs.

Q. Now assume a person with no exertional limitations, able to understand, remember, carry out only simple instructions, make judgments on simple work-related decisions, occasional interaction with the public, co-workers or supervisors. Any past work available?

　　　＊ ＊ ＊

A. Yes, they could do the janitor position and the dishwasher position.

Q. Would there be other jobs available for a person with those limitations?

A. Yes, sir, there would be. This is medium, unskilled work. One would be that of a laundry worker, 361.687-018, 10,000 jobs statewide, 275,000 nationally. Second one would be that of a general laborer, 589.686-026, 8,000 jobs statewide, 240,000 nationally, and a third one would be that of a kitchen helper, 317.684-010, 7,000 jobs statewide, and 285,000 nationally.

Q. If I could add the additional limitations of not able to work in production, fast-paced jobs and was able to work a job with infrequently changing work requirements, how does that affect the availability of those jobs?

A. None. I would maintain the same jobs.

(Tr. 51–52). The ALJ relied on his comprehensive hypothetical questions to the VE in determining that White was not disabled under the Act. This Court finds that the ALJ's questions to the VE were based upon the record and created a logical bridge from the evidence to the conclusion that White was not disabled. Additionally, White's counsel declined to question the VE. (Tr. 52). The Fifth Circuit has found that failure to cross-examine the VE or to present evidence to contradict the VE's testimony is significant evidence that the ALJ's hypothetical question to the VE was adequate. *See Perez v. Barnhart*, 415 F.3d 457, 464 (5th Cir. 2005).

Based upon the testimony of the VE and the medical records, substantial evidence supports the ALJ's finding that White could perform work without exertional limits with the restriction that he only have to understand, remember, and carry out detailed but not complex instructions, make judgments on detailed but not complex work-related decisions, and have frequent but not constant interaction with the public, co-workers, and supervisors. All the jobs identified by the VE were consistent with White's RFC, and are types of work that could be performed given White's work history, age, and education. Because the hypothetical questions contained all the functional limitations recognized by the ALJ, the Court concludes that the ALJ's reliance on the VE's testimony was proper, and that the VE's testimony, along with the medical evidence and the fact that White did not question the VE, constitutes substantial evidence to support the ALJ's conclusion that White was not disabled within the meaning of the Act and therefore was not entitled to benefits. Further, it is clear from the record that the proper legal standards were used to evaluate the evidence presented. Accordingly, this factor also weighs in favor of the ALJ's decision.

## VI. CONCLUSION

Considering the record as a whole, the Court is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which directed a finding that White was not disabled within the meaning of the Act, that substantial evidence supports the ALJ's decision, and that the Commissioner's decisions should be affirmed.

As such, it is

ORDERED that Plaintiff's Motion for Summary Judgment (Document No. 10) is DENIED, Defendant's Motion for Summary Judgment (Document No. 9) is GRANTED, and the decision of the commissioner of Social Security is AFFIRMED.

Signed at Houston, Texas, this _12TH_ day of _August_, 2013.

_Frances H. Stacy_

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE